UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                                                   :
MARCEANN DUNNING, *individually and on behalf of*                  :
*all others similarly situated*, and AMBER LATIF,                  :
*individually and on behalf of all others similarly situated*,     :
                                                                   :
                               Plaintiffs,                         :
                                                                   :
                -v-                                                :     23 Civ. 11242 (JPC)
                                                                   :
SUPERGOOP, LLC,                                                    :     OPINION AND ORDER
                                                                   :
                               Defendant.                          :
                                                                   :
-------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

Plaintiffs MarceAnn Dunning and Amber Latif bring this putative class action against Defendant Supergoop, LLC ("Supergoop"), alleging that two of Supergoop's sunscreen products contain a lower Sun Protection Factor ("SPF") level than indicated on the products' labels. Supergoop has moved to dismiss the Amended Complaint, arguing *inter alia* that Plaintiffs have failed to adequately plead facts necessary to establish their Article III standing to sue. The Court agrees. Because the Amended Complaint lacks sufficient allegations to support the existence of an injury-in-fact for either Plaintiff, Supergoop's motion to dismiss is granted. This dismissal is without prejudice and Plaintiffs are granted leave to further amend if they believe they can sufficiently allege standing.[1]

---

[1] The Court determines that oral argument is not necessary to resolve the motion to dismiss and thus denies Supergoop's request for oral argument, Dkt. 23.

## I. Background[2]

**A.      Facts**

Supergoop formulates, manufactures, labels, advertises, distributes, and sells sunscreen products nationwide. Am. Compl. ¶ 8. Customers may purchase Supergoop's products directly on the company's website, as well as through online and brick and mortar retailers. *Id.* ¶ 13. One of those products is Supergoop's Unseen Sunscreen SPF 40, which comes in formulations for both face ("Unseen Face Sunscreen") and body ("Unseen Body Sunscreen") (together, the "Products"). *Id.* ¶¶ 15-16. The Products prominently state on their Principal Display Panels ("PDPs") that they are "SPF 40." *Id.* ¶ 1. The Amended Complaint includes the following visual depiction of the Products, *id.* at 5:



---

[2] The following facts, which are assumed true for purposes of this Opinion and Order, are taken from the Amended Complaint, Dkt. 16 ("Am. Compl."). *See Sweet v. Sheahan*, 235 F.3d 80, 83 (2d Cir. 2000) ("When considering a motion to dismiss pursuant to Rule 12(b)(1), the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff."); *see also Robinson v. Gov't of Malaysia*, 269 F.3d 133, 140 (2d Cir. 2001) (explaining that "[i]n a motion to dismiss pursuant to [Rule] 12(b)(1), the defendant may challenge either the legal or factual sufficiency of the plaintiff's assertion of jurisdiction, or both," and that when "the defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations . . . the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff" (internal quotation marks omitted)).

A distinguishing feature of Supergoop's Unseen Sunscreen is, as the name suggests, the sunscreen's "invisible" formulation when applied. *Id.* ¶ 17. Unlike many sunscreens that appear white out of the tube or when applied on the skin, Unseen Face Sunscreen is nearly clear, enabling it to double as a cosmetic product used to allow makeup to go on more smoothly and stay on longer. *Id.* ¶¶ 17-18. Unseen Face Sunscreen comes in three sizes: the 1.7 ounce size costs $38, the 1 ounce size costs $28, and the 0.68 ounce size costs $22. *Id.* ¶ 20. Unseen Body Sunscreen comes in a 3.4 ounce size and is sold for $42. *Id.* ¶ 22. The Products are priced at a premium compared to comparable products that are not advertised as SPF 40. *Id.* ¶ 23.

A sunscreen's SPF value is important to consumers for obvious reasons. *See id.* ¶¶ 24-27. A sunscreen with a higher SPF offers greater protection against sunburn by filtering more of the sun's rays than a sunscreen with a lower SPF. *Id.* ¶¶ 4, 24; *see id.* ¶ 24 ("SPF is a measure of how much solar energy (UV radiation) is required to produce sunburn on protected skin (i.e., in the presence of sunscreen) relative to the amount of solar energy required to produce sunburn on unprotected skin." (quoting a Food and Drug Administration article about SPF)). Seeking greater sun protection, consumers frequently purchase sunscreen based on its SPF. *Id.* ¶ 25; *see id.* ¶ 26 (citing a 2021 study in *JAMA Dermatology* for the proposition that "SPF is the most important attribute of a sunscreen product from the perspective of consumers").

On or around April 12, 2023, Dunning purchased Supergoop Mini Unseen Sunscreen SPF 40 for face from a Sephora in a Kohl's store in Nanuet, New York. *Id.* ¶ 6. As alleged, Dunning reasonably believed that the item she purchased provided SPF 40 sun protection based on the product's representation on its PDP. *Id.* Dunning paid $22 for the product, but insists that had she known that the sunscreen in fact contained a materially lower SPF, she would not have purchased it or would have paid significantly less for it. *Id.* In or around March 2023, Latif purchased

Supergoop Unseen Sunscreen SPF 40 for body (collectively with the Supergoop Mini Unseen Sunscreen SPF 40 for face that Dunning purchased, the "Purchased Products") from an Ulta store in Pleasant Hill, California. *Id.* ¶ 7. Like Dunning, Latif allegedly reasonably believed the product provided SPF 40 sun protection based on the representation on the PDP. *Id.* And also like Dunning, Latif contends that if she had known that item contained a materially lower SPF, she would not have purchased it or would have paid significantly less for it. *Id.*

The Food and Drug Administration ("FDA") regulates sunscreens to ensure that they meet safety and effectiveness standards. *Id.* ¶ 28. Pursuant to the FDA's regulations, sunscreen products are tested on the backs of human subjects, after which five successive doses of UV rays are applied. *Id.*; *see* 21 C.F.R. § 201.327. The test must include enough subjects to obtain a minimum of ten valid test results, "from which the mean, standard deviation, t value and standard error ('SE') are determined." Am. Compl. ¶ 29 (citing 21 C.F.R. § 201.327(i)). "The 'SPF Label Value' equals the largest whole number less than *Mean SPF - (t x SE)*." *Id.* (quoting 21 C.F.R. § 201.327(i)). Under the FDA's regulations, the SPF listed on the PDP of a sunscreen product must be the numerical SPF Label Value obtained from a compliant test result. *Id.* ¶ 30.

Plaintiffs allege that they conducted an SPF test of Unseen Face Sunscreen and Unseen Body Sunscreen (the "Tested Products") "in accordance with FDA regulations for determination of SPF Label Value." *Id.* ¶¶ 5, 32. This testing determined that the tested Supergoop Unseen Face Sunscreen had an SPF Label Value of 23, while the tested Supergoop Unseen Body Sunscreen had an SPF Label Value of 20. *Id.* Plaintiffs allege that Supergoop knew or should have known that the Products contain a materially lower SPF protection than the advertised SPF 40, because they were required to perform testing to determine the Products' SPF Label Values in accordance with the FDA's regulations. *Id.* ¶ 33.

Plaintiffs bought the Purchased Products believing that they provided SPF 40 sun protection as indicated on those items' PDPs, and contend that they would purchase the Products again if they had a true SPF Label Value of SPF 40.  *Id.* ¶¶ 34, 37.  Plaintiffs further allege that they would not have purchased the Purchased Products if they had known they in fact had an SPF Label Value of 23 and 20, nor would they have paid such a high price for the items.  *Id.* ¶¶ 35-36, 39.  Plaintiffs allege that as a result of these alleged false and misleading statements, they "did not receive the benefit of the advertised SPF 40 and were deprived of the benefit of the bargain they were promised by [Supergoop]."  *Id.* ¶ 40.

**B.     Procedural History**

Plaintiffs commenced this action against Supergoop on December 28, 2023, Dkt. 1, and filed the operative Amended Complaint on March 14, 2024, Dkt. 16.  The Amended Complaint brings the lawsuit as a putative class action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), Am. Compl. ¶ 9, identifying three classes: a nationwide class of "[a]ll persons in the United States who purchased the Products between 2018 and the Present ('Class Period') (the 'Class')," a subclass of "[a]ll persons in New York who purchased the Products during the Class Period (the 'New York Subclass')," and a second subclass of "[a]ll persons in California who purchased the Products during the Class Period (the 'California Subclass')."  *Id.* ¶ 41.

The Amended Complaint pleads seven claims: (1) violations of New York General Business Law § 349, *id.* ¶¶ 58-65; (2) violations of New York General Business Law § 350, *id.* ¶¶ 66-73; (3) breach of express warranty, *id.* ¶¶ 74-80; (4) violations of California's Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.*, Am. Compl. ¶¶ 81-88; (5) violations of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*, Am. Compl. ¶¶ 89-104; (6) violations of California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.*,

Am. Compl. ¶¶ 105-115; and (7) unjust enrichment, *id.* ¶¶ 116-121.[3]  Plaintiffs' Amended Complaint pleads several forms of relief, including injunctive relief.  *See id.* at 25.

On May 9, 2024, Supergoop filed a motion to dismiss the Amended Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).[4]  Dkts. 21, 22 ("Motion").  Supergoop also moved to stay discovery pending resolution of its motion to dismiss, Dkt. 24, which the Court granted on May 22, 2024, Dkt. 26.  Plaintiffs filed their opposition to the motion to dismiss on June 21, 2024.  Dkt. 27 ("Opposition").  Supergoop filed its reply on July 1, 2024.  Dkt. 28 ("Reply").  Both parties subsequently filed letters notifying the Court of supplemental authority.  *See* Dkts. 29, 30.

## II.  Discussion

### A.  Legal Standard

Supergoop moves to dismiss Plaintiffs' claims under Rule 12(b)(1) for lack of standing, and thus lack of subject matter jurisdiction.  "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."  *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  Challenges to the Court's subject matter jurisdiction under Rule 12(b)(1) come in two forms: facial or factual.  *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016).  Where, as here, a defendant

---

[3] The first and second claims are brought on behalf of Dunning and the New York Subclass, Am. Compl. ¶¶ 58-73, the fourth through sixth claims are brought on behalf of Latif and the California Subclass, *id.* ¶¶ 81-115, and the third and seventh claims are brought on behalf of both Plaintiffs and the Class, *id.* ¶¶ 74-80, 116-121.

[4] Because the Court concludes that Plaintiffs' Amended Complaint fails to adequately allege subject matter jurisdiction under Rule 12(b)(1), the Court does not reach Supergoop's alternate bases for dismissal under Rule 12(b)(6).  *See Calcano v. Swarovski N. Am. Ltd.*, 36 F.4th 68, 74 (2d Cir. 2022) (explaining that when a party brings a motion to dismiss for both lack of standing and failure to state a claim, a court must "begin with standing because it is a 'jurisdictional' requirement and 'must be assessed before reaching the merits'" (quoting *Byrd v. United States*, 584 U.S. 395, 410-11 (2018))).

raises a facial challenge to standing, *i.e.*, one "based solely on the allegations of the complaint or the complaint and exhibits attached to it," a court's task "is to determine whether the [p]leading alleges facts that affirmatively and plausibly suggest that the plaintiff has standing to sue." *Id.* (internal quotation marks omitted) (alterations in original omitted). The plaintiff bears no evidentiary burden in refuting such a challenge. *Id.* The court will accept the complaint's factual allegations as true and "draw all reasonable inferences in favor of the plaintiff." *Id.* at 56-57 (internal quotation marks omitted) (alteration in original omitted).

"The Supreme Court has held that 'if none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendant[], none may seek relief on behalf of himself or any other member of the class.'" *Central States S.E. & S.W. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 199 (2d Cir. 2005) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974)). "Moreover, the named class plaintiffs 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'" *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 502 (1975)).

**B.    Article III Standing**

"[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Supergoop's motion is predicated on Plaintiffs' failure to adequately allege an injury-in-fact. Supergoop argues that Plaintiffs have failed to allege sufficient facts to permit an inference that the Purchased Products—*i.e.*, the sunscreens that Plaintiffs actually bought—were misleadingly labeled. *See* Motion at 6-7. Specifically, Supergoop contends

that "Plaintiffs do not allege that they tested the products they purchased . . . or otherwise link their purchased Products to their testing, and thus plead insufficient facts to allow for an inference that their purchased Products, in fact, contained a lower SPF than indicated on the Products' labels." *Id.* at 5.

"[A]t the pleading stage, 'general factual allegations of injury resulting from the defendant's conduct may suffice.'" *John v. Whole Foods Market Grp., Inc.*, 858 F.3d 732, 736 (2d Cir. 2017) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). Notwithstanding this relatively lenient pleading standard, Plaintiffs still "must plead enough facts to make it plausible that they did indeed suffer the sort of injury that would entitle them to relief." *Maddox v. Bank of N.Y. Mellon Tr. Co., N.A.*, 19 F.4th 58, 65-66 (2d Cir. 2021) (internal quotation marks omitted). Plaintiffs endeavor to base their standing on a price-premium theory of injury, *see* Opposition at 4-5, a theory that "has been broadly accepted in the Second Circuit," *Hicks v. L'Oreal U.S.A., Inc.* ("*Hicks I*"), No. 22 Civ. 1989 (JPC), 22 Civ. 3926 (JPC), 2023 WL 6386847, at *7 (S.D.N.Y. Sept. 30, 2023). Nevertheless, a price-premium theory still requires sufficient factual allegations "to allow the inference that the [Purchased Products] in fact [were misbranded], or that there was a material risk that they [were]." *Id.*

Where, as here, a plaintiff relies on testing to support allegations of misbranding, "[t]he most direct route" to establishing injury-in-fact would be to include the actual product the plaintiff purchased in that testing. *Onaka v. Shiseido Ams. Corp.*, No. 21 Civ. 10665 (PAC), 2024 WL 1177976, at *2 (S.D.N.Y. Mar. 19, 2024); *see also Hicks v. L'Oreal U.S.A., Inc.* ("*Hicks II*"), No. 22 Civ. 1989 (JPC), 22 Civ. 3926 (JPC), 2024 WL 4252498, at *9 (S.D.N.Y. Sept. 19, 2024) (explaining that "[s]uch direct proof is the cleanest and most effective way to establish such an injury"). In the Amended Complaint, Plaintiffs allege that they purchased two of the Products—

*i.e.*, the Purchased Products—in March and April 2023. Am. Compl. ¶¶ 6-7. They further allege that they conducted SPF testing on certain of the Products—*i.e.*, the Tested Products—in accordance with FDA regulations. *Id.* ¶¶ 5, 32. But the Amended Complaint does not allege that Plaintiffs tested the actual Products that they purchased. Rather, they merely allege that, on some unspecified date, they conducted testing that "revealed that the Unseen Face Sunscreen has an SPF Label Value of 23 and the Unseen Body Sunscreen has an SPF Label Value of 20." *Id.* ¶ 32. Thus, the Amended Complaint does not take the "most direct route" to establishing an injury-in-fact, preventing the Court from concluding that the Purchased Products were definitely mislabeled. *Onaka*, 2024 WL 1177976, at *2.[5]

But "[c]aselaw in this Circuit recognizes . . . that it may not always be possible to test the actual product purchased by a plaintiff." *Hicks II*, 2024 WL 4252498, at *9. "Thus, in certain circumstances, a plaintiff may plausibly allege the presence of a [misbranded element] in the purchase via indirect means, provided the plaintiff sufficiently links the results of independent testing of the same product line to the product actually purchased." *Id.* So Plaintiffs may establish standing by "meaningfully linking those results" to their actual Purchased Products, *Hicks I*, 2023 WL 6386847, at *9, such as by showing "that the mislabeling was systematic and routine." *John*, 858 F.3d at 736-37 (internal quotation marks and alteration omitted). Under *John*, the Second Circuit's leading case in this area, a court may "infer that the plaintiff purchased a specific product with a defect that had been plausibly reported by third-party tests to be widespread, systematic, routine, or uniform." *Hicks II*, 2024 WL 4252498, at *9 (internal quotation marks omitted).

---

[5] Plaintiffs' reliance on *Bowen v. Energizer Holdings, Inc.*, 118 F.4th 1134 (9th Cir. 2024), is misplaced. *See* Dkt. 29. *Bowen* involved a factual challenge to standing rather than a facial challenge, and the Ninth Circuit's reversal was predicated on its conclusion that the district court improperly relied upon disputed issues of fact in reaching its decision. 118 F.4th at 1149-50.

Courts look to a variety of factors to determine whether a meaningful link exists between the results of testing and a plaintiff's actual purchases to permit such a plausible inference. First, and "[p]erhaps most significant is temporal proximity; any testing must have occurred reasonably near in time to the plaintiffs' purchases." *Id.* at *10 (internal quotation marks omitted) (collecting cases); *see, e.g.*, *Kell v. Lily's Sweets, LLC*, No. 23 Civ. 147 (VM), 2024 WL 1116651, at *4 (S.D.N.Y. Mar. 13, 2024) (finding significant that "the Complaint lack[ed] any factual allegations about whether [the products purchased] and the samples tested . . . were purchased in similar circumstances (for instance, whether [the plaintiff] purchased them at a similar time and place)"). Second, "[t]he pleading also should disclose the number of samples tested, and the testing should involve more than a small number." *Hicks II*, 2024 WL 4252498, at *10 (collecting cases); *see, e.g.*, *Brown v. Coty, Inc.*, No. 22 Civ. 2696 (AT), 2024 WL 894965, at *4 (S.D.N.Y. Mar. 1, 2024) (contrasting the facts from *John* because the "Plaintiffs do not allege how many lots or tubes of [the products] were tested," nor how "pervasive" the mislabeling was found to be within the sample). Third, and "[t]o the extent relevant to the product at issue, courts also have considered the geographic proximity of the testing to the plaintiff's purchases." *Hicks II*, 2024 WL 894965, at *10 (collecting cases); *see, e.g.*, *Esquibel v. Colgate-Palmolive Co.*, No. 23 Civ. 742 (LTS), 2023 WL 7412169, at *2 (S.D.N.Y. Nov. 9, 2023) (critiquing the plaintiffs for failing to provide information on "where those units [tested] were acquired"). Taken together, these factors help a judge answer the ultimate question of whether the presence of mislabeling in a product "is so widespread as to render it plausible that any Plaintiff purchased a mislabeled Product at least once." *Hicks II*, 2024 WL 894965, at *10 (internal quotation marks omitted).

The Amended Complaint makes three allegations about the testing Plaintiffs conducted. It has a statement that "Plaintiffs conducted SPF testing of the Products in compliance with FDA

requirements," which determined that the Tested Products had different SPF Label Values than those represented. Am. Compl. ¶ 5. Next, the Amended Complaint offers a generic description of what the FDA's testing methodology to determine a sunscreen's SPF entails, citing the relevant federal regulation, 21 C.F.R. § 201.327. Am. Compl. ¶¶ 28-30. Finally, it alleges that "[a]n SPF test conducted in accordance with FDA regulations for determination of SPF Label Value revealed that the Unseen Face Sunscreen has an SPF Label Value of 23 and the Unseen Body Sunscreen has an SPF Label Value of 20." *Id.* ¶ 32.

Viewed with an eye on the three factors identified above, the Amended Complaint is plainly deficient in its pleading of an injury-in-fact, for multiple independent reasons. First, while the Amended Complaint alleges that Dunning and Latif purchased the Products in March and April 2023, Am. Compl. ¶¶ 6-7, it contains no allegations of the purchase dates of the samples that were tested. The Amended Complaint does not even allege whether the Tested Products were purchased before or after Plaintiffs made their purchases. The absence of such allegations "frustrate[s] any ability to evaluate temporal proximity with Plaintiffs' purchases." *Hicks II*, 2024 WL 4252498, at *10. Second, the Amended Complaint does not disclose the number of samples tested. Although the Amended Complaint alleges that testing in compliance with FDA regulations "must include enough subjects to obtain a minimum of 10 valid test results," Am. Compl. ¶ 29, and that Plaintiffs conducted "[a]n SPF test . . . in accordance with FDA regulations, *id.* ¶ 32, it remains unclear what Plaintiffs' testing in fact entailed. For instance, did Plaintiffs test ten different samples of the Products? Or did they test one sample of each Product on the backs of ten human subjects? Indeed, the Amended Complaint contains just scant details of their testing, described in a few broad and general statements with no specifics of the methods employed. *See id.* ¶¶ 5, 32. Finally, the Amended Complaint does not allege where the Tested Products were purchased or any other

indication that they were purchased in geographic proximity to where Plaintiffs made their purchases. Nor do Plaintiffs allege that "the Products were produced in a consistent manner through a standardized manufacturing process" to attempt to excuse their failure to allege geographic proximity. *Hicks II*, 2024 WL 894965, at *11 n.10.

Given the lack of specific allegations bearing on these factors, or otherwise establishing a meaningful link between the test results and the Purchased Products, the Court cannot draw the inference that mislabeling in the Products was "so widespread as to render it plausible that any Plaintiff purchased a mislabeled Product at least once." *Hicks II*, 2024 WL 4252498, at *10 (internal quotation marks omitted); *see Hicks I*, 2023 WL 6386847, at *9 (granting a motion to dismiss where the complaint's "allegations boil down to describing general and unspecific results of testing, without meaningfully linking those results to Plaintiffs' actual Purchased Products"). "On the basis of Plaintiffs' sparse factual allegations, the Court cannot conclude that [mislabelling] in [the Products] that Plaintiffs purchased was anything more than a 'sheer possibility.'" *Esquibel*, 2023 WL 7412169, at *2 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

Contrary to Plaintiffs' suggestion, this analysis does not "invent[] a new standard." Opposition at 6. Rather, the requirement that "named class plaintiffs 'must allege and show that they personally have been injured,'" is simply a corollary of the traditional principles of the injury-in-fact requirement for Article III standing. *Merck-Medco Managed Care*, 433 F.3d at 199 (quoting *Warth*, 422 U.S. at 502). And while there may be "no indication the Products Plaintiffs purchased were different from that otherwise available in the market and would have performed any differently," Opposition at 6, there also are no allegations that allow the inference that the Purchased Products were like those that allegedly proved deficient in testing. It is incumbent on Plaintiffs to make a pleading that "alleges facts that affirmatively and plausibly suggest that the

12

plaintiff has standing to sue." *Carter*, 822 F.3d at 56 (internal quotation marks omitted and alterations adopted); *see Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.a.r.l.*, 790 F.3d 411, 417 (2d Cir. 2015) ("The plaintiff bears the burden of alleging facts that affirmatively and plausibly suggest that it has standing to sue." (internal quotation marks omitted and alterations adopted)).

Plaintiffs also contend that their allegation that the Products' "failure to meet the[ FDA's] established standards plausibly establishes an injury in fact." Opposition at 7. As discussed, however, while Plaintiffs claim to have used a standard testing methodology on some unspecified date on some unspecified number of Products, that alone is insufficient to draw a meaningful link between the Products that were tested and those that Plaintiffs purchased. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (explaining that to establish standing for any of their claims, Plaintiffs must show an injury-in-fact which is "particularized," meaning that it "must affect the plaintiff in a personal and individual way" (internal quotation marks omitted)). And insofar as Plaintiffs suggest that they have standing to sue Supergoop to enforce the FDA's regulations, that is incorrect as well. *See Barreto v. Westbrae Natural, Inc.*, 518 F. Supp. 3d 795, 800 (S.D.N.Y. 2021) (dismissing a complaint on the basis that "enforcement of FDA regulations is reserved to the government, and for [a plaintiff's] claims to survive [the plaintiff] must allege a deceptive or misleading act or practice and not merely a violation of a regulation").

Supergoop also argues that Plaintiffs lack standing to seek an injunction. *See* Motion at 8. Plaintiffs maintain that they have standing to sue for injunctive relief based on their allegation that they "would purchase the Products again if they had a true SPF Label Value of SPF 40, as advertised," Am. Compl. ¶ 37. *See* Opposition at 7-9. Second Circuit authority forecloses this theory of standing.

In *Berni v. Barilla S.P.A.*, 964 F.3d 141 (2d Cir. 2020), the Second Circuit noted "that past purchasers of a consumer product who claim to be deceived by that product's packaging . . . have, at most, alleged a past harm." *Id.* at 147. This harm "is commonly redressable at law through the award of damages" and in such a situation "past purchasers of a product . . . are not likely to encounter future harm of the kind that makes injunctive relief appropriate." *Id.* This is particularly so because "even if they do purchase it again, there is no reason to believe that all, or even most, of the class members will incur a harm anew," as "[s]upposing that they have been deceived by the product's packaging once, they will not again be under the [same] illusion," and "[i]nstead, next time . . . they will be [purchasing] with exactly the level of information that they claim they were owed from the beginning." *Id.* at 148. As such, injunctive relief "will not materially improve their position as knowledgeable consumers." *Id.* While *Berni* presented a different procedural context (*i.e.*, class certification), the Second Circuit's reasoning remains persuasive and applies to the facts at hand.[6] Accordingly, Plaintiffs lack standing to pursue injunctive relief.

In the absence of a sufficiently pleaded injury-in-fact, Plaintiffs have failed to establish standing. The Amended Complaint therefore is dismissed without prejudice. *See John*, 858 F.3d at 737 ("[W]here a complaint is dismissed for lack of Article III standing, the dismissal must be without prejudice, rather than with prejudice.").

---

[6] Plaintiffs' appeal to contrary Ninth Circuit precedent, *see* Opposition at 8 (citing *Davidson v. Kimberly-Clark Corp.*, 889 F.2d 956 (9th Cir. 2018)), is unpersuasive given the Second Circuit's reasoning in *Berni*. *See Grossman v. Simply Nourish Pet Food Co. LLC*, 516 F. Supp. 3d 261, 274-75 & n.4 (E.D.N.Y. 2021) (rejecting an appeal to out-of-circuit precedent on this issue in favor of the "binding Second Circuit precedent" in *Berni*); *Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453, 464-66 (S.D.N.Y. 2020) (declining to adopt the Ninth Circuit's view because "[t]he conditionality of this alleged injury removes it from the harms that Article III authorizes federal courts to remedy").

### C.    Leave to Amend

Lastly, the Court considers whether to grant leave to amend.  Under Rule 15(a) of the Federal Rules of Civil Procedure, a court "should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Plaintiffs have not asked for leave to further amend their Amended Complaint. "But even when a party does not ask for leave to amend, the Court may grant leave to amend *sua sponte*."  *In re Garrett Motion Inc. Sec. Litig.*, No. 20 Civ. 7992 (JPC), 2022 WL 976269, at *18 (S.D.N.Y. Mar. 31, 2022) (internal quotation marks omitted) (collecting cases). When deciding whether to grant *sua sponte* leave to amend, "courts will consider many factors, including undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies, undue prejudice to the opposing party, and futility."  *Morales v. Kimberly-Clark Corp.*, No. 18 Civ. 7401 (NSR), 2020 WL 2766050, at *9 (S.D.N.Y. May 27, 2020).

The defects in the Amended Complaint identified above do not necessarily mean that granting leave to amend would be futile.  It is possible, for example, that Plaintiffs could plead additional allegations concerning the testing they conducted which would support an inference that "meaningfully link[s] those results to Plaintiffs' actual Purchased Products."  *Hicks I*, 2023 WL 6386847, at *9.  Nor would Supergoop be unduly prejudiced by an amendment, as it is on notice as to the basic circumstances underlying the claims.  The Court therefore *sua sponte* grants Plaintiffs leave to amend, but emphasizes that Plaintiffs should file a Second Amended Complaint only if they believe they can remedy the pleading deficiencies identified above.

### III.  Conclusion

For the foregoing reasons, the Court grants Supergoop's motion to dismiss and the Amended Complaint is dismissed without prejudice.  Plaintiffs' Second Amended Complaint, if

any, is due two weeks from the date of this Opinion and Order.  The Clerk of Court is respectfully directed to close Docket Number 21.

    SO ORDERED.

Dated: January 6, 2025
       New York, New York

                                               JOHN P. CRONAN
                                       United States District Judge