## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARCEANN DUNNING, AMBER LATIF, and JANET BEAUDOIN, individually and on behalf of all others similarly situated,<br><br>          **Plaintiffs,**<br><br>  v.<br><br>SUPERGOOP, LLC,<br><br>          **Defendant.** | **Case No. 1:23-cv-11242-JPC**<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs, by their attorneys, on behalf of themselves and all others similarly situated, allege the following pursuant to the investigation of their counsel and based on information and belief, except as to allegations pertaining to personal knowledge as to themselves.

## NATURE OF THE ACTION

1. This is a class action against Defendant Supergoop, LLC ("Supergoop" or "Defendant") by Plaintiffs on behalf of themselves and all others similarly situated who purchased Supergoop Unseen Sunscreen SPF 40 products for face or body (the "Products" or the "Unseen Sunscreens"). The Products' Principal Display Panels ("PDPs") prominently state that the Products are "SPF 40." As described herein, the representation "SPF 40" on the PDPs is false and misleading as the Products[1] are not SPF 40 and, in fact, provide a significantly lower SPF protection.

2. Consumers such as Plaintiffs buy sunscreen to prevent sunburns and other effects of exposure to ultraviolet radiation such as skin cancer and premature aging (including skin spots,

---

[1] Based on the mislabeling of the Products, Plaintiffs believe that the misconduct extends to other Supergoop sunscreen products to be identified in discovery.

wrinkles, and leathery skin).[2]  In the United States, approximately 4.3 million people are treated for basal cell carcinoma and squamous cell carcinoma, the two most common types of skin cancer, each year.[3]

3.    Nearly all sunscreen users report using sunscreen to protect against skin cancer (89%).[4]  Additionally, 69% of adults report using sunscreen to protect against premature aging, an increase of 25% since 2021.[5]

4.    Sun Protection Factor ("SPF") informs consumers of the level of protection provided by the sunscreen.  A sunscreen with a higher SPF filters more of the sun's rays than a sunscreen with a lower SPF.

5.    The SPF of a given sunscreen is the result of the specific combination of UV absorbing or blocking ingredients (known as "active ingredients") that it contains. There two types of sunscreens: (a) "physical blockers" that reflect UV rays from the sun with titanium dioxide, zinc oxide, or a combination of both, and (b) "chemical blockers" that absorb the sun's ultraviolet rays typically using aminobenzoic acid, avobenzone, octisalate, octocrylene, and/or oxybenzone. Homosalate is another chemical ingredient often used in chemical blockers due to its ability to absorb a specific part of the UV spectrum (i.e., UVB light) although it is not generally recognized as safe and effective by the FDA due to limited safety data.

6.    Regardless of the type of sunscreen, how effective a given sunscreen is at blocking or absorbing UV radiation (i.e., its SPF) is a product of the level of active ingredients. The Unseen

---

[2] U.S. Food & Drug Admin., *Tips to Stay Safe in the Sun: From Sunscreen to Sunglasses*, https://www.fda.gov/consumers/consumer-updates/tips-stay-safe-sun-sunscreen-sunglasses (last visited Dec. 27, 2023).
[3] *Id.*
[4] Carson Kitzmiller, *Sunscreen Fountain of youth: Use of sunscreen for anti-aging purposes increased 25% from 2021-22,* MINTEL GROUP INC. (Mar. 7, 2023), https://www.mintel.com/press-centre/sunscreen-fountain-of-youth-use-of-sunscreen-for-anti-aging-purposes-increased-25-from-2021-22/.
[5] *Id.*

Sunscreens described above are chemical blockers that contained the specific active ingredient levels during the Class Period: (a) for Unseen Body Sunscreen, which Plaintiff Latif purchased: Avobenzone 3%, Homosalate 9%, Octisalate 5%, Octocrylene 10%; (B) for Unseen Face Sunscreen, which Plaintiffs Dunning and Beaudoin purchased:  Avobenzone 3%, Homosalate 8%, Octisalate 5%, Octocrylene 4%.

7.       Plaintiffs purchased Supergoop Products with the same levels of active ingredients described above. At the time of their purchase, and indeed throughout the entire Class Period, there were no reports, announcements, press releases or other indications—e.g., a Product recall or manufacturing defect—that any of the Products deviated from the stated active ingredients, and thus SPF 40 value. As a result, Plaintiffs reasonably expected that the Products they purchased would perform at as SPF 40 sunscreen.

8.       Testing conducted on the Products, however, shows they were not SPF 40. Plaintiffs subjected three 1.7 oz (50 ml) bottles of the Unseen Face Sunscreen and two 3.4 oz (100 ml) bottles of the Unseen Body Sunscreen with same active ingredients as the ones they purchased to laboratory testing in accordance with FDA requirements for SPF labeling outlined in 21 CFR 201.327.  In accordance with SPF testing requirements, the Products were each applied to the backs of 10 health human subjects of various skin types who were then exposed to progressive amounts of UV light to determine the minimal erythema dose ("MED"), which is the smallest UV dose that produces perceptible redness of the skin (erythema) with clearly defined borders at 16 to 24 hours after UV exposure. According to FDA regulations, the acceptable SPF label value is then calculated from the MED results using a series of formulas specified in 21 CFR § 201.327(i)(2)(ii)(D)(6). Plaintiffs' testing showed that the SPF Label Value of the Supergoop Unseen Face Sunscreen with the active ingredients listed above is not SPF 40, as represented, but

SPF 23, and the SPF Label Value of the Supergoop Unseen Body Sunscreen with the active ingredients listed above, is also not SPF 40, but SPF 20.

9.      These test results reflect the true SPF Label Values of the Products Plaintiffs purchased because the active ingredients in their sunscreen are the same. As a result, Plaintiffs overpaid for screen that was SPF 40 but received less effective, lower value screen with an SPF of nearly half. Plaintiffs would not have purchased the Products had they known that they were not SPF 40, and in fact substantially less.

## THE PARTIES

10.     Plaintiff MarceAnn Dunning is a citizen of New York and currently resides in Hornell, New York.  On or around April 12, 2023, Plaintiff Dunning purchased "mini" sized bottle of Supergoop Unseen Sunscreen SPF 40 for face from Sephora in Kohl's Nanuet in Nanuet, New York for $22.  Based on the representation "SPF 40" on the PDP of the Product, Dunning reasonably believed that the Product provided SPF 40 sun protection for the reasons described herein.  Had she known the truth that the Product contained a materially lower SPF, she would not have purchased it or would have paid significantly less for it. As such, she has been injured as a direct result of Defendant's conduct.

11.     Plaintiff Amber Latif is a citizen of California and currently resides in Antioch, CA. On or around March 2023, Latif purchased Supergoop Unseen Sunscreen SPF 40 for body from Ulta in Pleasant Hill, California for $42. Based on the representation "SPF 40" on the PDP of the Product, Latif reasonably believed that the Product provided SPF 40 sun protection for the reasons described herein.  Had she known the truth that the Product contained a materially lower SPF, she would not have purchased it, or would have paid significantly less for it. As such, she has been injured as a direct result of Defendant's conduct.

12.     Janet Beaudoin is a citizen of Florida and maintains a residence in Livonia, Michigan. On July 16, 2023 and October 22, 2024, while at her home in Michigan, Plaintiff Beaudoin purchased Supergoop Unseen Sunscreen SPF 40 from Amazon.com for $38. Based on the representation "SPF 40" on the PDP of the Products, Beaudoin reasonably believed the Products provided SPF 40 sun protection for the reasons described herein. Had she known the truth that the Product contained a materially lower SPF, she would not have purchased it, or would have paid significantly less for it. As such, she has been injured as a direct result of the Defendant's conduct.

13.     Defendant Supergoop LLC is a Delaware Limited Liability Corporation with primary office locations in San Antonio, Texas and New York, New York.[6]  Upon information and belief, Supergoop's headquarters is located in New York, NY, and its primary business functions emanate from New York.[7]  Defendant Supergoop is responsible for the formulation, manufacturing, labeling, advertising, distribution, and sale of the Products nationwide, including in this District.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this lawsuit under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) because this is a proposed class action in which: (1) there are at least 100 Class members; (2) the combined claims of Class members exceed $5,000,000, exclusive of interest, attorneys' fees, and costs; and (3) Defendant and at least one Class member are domiciled in different states.

15.     This Court has general personal jurisdiction over Defendant because it maintains

---

[6] SUPERGOOP!, https://supergoop.com/pages/careers (last visited Dec. 27, 2023).
[7] Supergoop's Chief Executive Officer ("CEO") until December 2023, Amanda Baldwin, was located in New York.  Additionally, its Chief Operating Officer and Chief Financial Officer, Ryan Crowley, and Chief Marketing Officer, Britany LeBlanc, are located in New York.

its principal place of business in New York. Defendant is also subject to specific personal jurisdiction in this State because it maintains sufficient minimum contacts with the State of New York and a substantial part of the events and conduct giving rise to Plaintiffs' and Class members' claims occurred in this state.

16.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because Defendant resides in this district.

## FACTUAL ALLEGATIONS

### A.    History of Supergoop

17.    Supergoop is a sunscreen brand founded by Holly Thaggard. Thaggard launched the brand in 2007 after her friend was diagnosed with skin cancer when they were in their early 30s and learned that a common reason that people do not wear sunscreen is because they do not like the feel of sunscreen on the skin.  She set out to create a product to "fill the void" for a "conscious, clean, feel-good product" that people would want to wear every day.[8]

18.    Supergoop brand products, including the Unseen Sunscreens, are sold directly to consumers through its website, and at online and brick and mortar retailers including Nordstrom, Sephora, Anthropologie, Blue Mercury, and Amazon.[9]

19.    In 2022, Supergoop reached $250 million in sales.[10]

---

[8] Sunhee Grinnell, *Meet the "Norma Rae" of Sunscreen: Holly Thaggard, Founder and CEO of Supergoop!,* VANITY FAIR (Jan. 4, 2018), https://www.vanityfair.com/style/2018/01/meet-the-norma-rae-of-sunscreen-holly-thaggard-founder-and-ceo-of-supergoop#:~:text=It%20was%20in%202007%20that, million%20people%20worldwide%20each%20year.

[9] SUPERGOOP!, https://supergoop.com/pages/find-supergoop-near-you (last visited Dec. 27, 2023).

[10] Hikmat Mohammed, *Supergoop is Aiming to Build an SPF Empire,* WOMEN'S WEAR DAILY (Jul. 11, 2023), https://wwd.com/beauty-industry-news/skin-care/amanda-baldwin-supergoop-interview-ceo-1235739876/.

**B.     Supergoop's Unseen Sunscreens**

20.     Supergoop Unseen Sunscreen SPF 40 is a "100% invisible, weightless, scentless sunscreen with broad spectrum SPF protection, skincare benefits & a natural finish."

21.     Supergoop Unseen Sunscreen comes in formulations for both face (the "Unseen Face Sunscreen") and body (the "Unseen Body Sunscreen"), both labeled as SPF 40.

 

**Figure 1.**
The Supergoop Unseen Face Sunscreen (left) and Unseen Body Sunscreen (right) showing the Products' PDPs.

22.    A unique attribute of the Unseen Sunscreens is their "invisible" formulation. While many sunscreens appear white out of the tube and/or when applied on the skin, the Unseen Sunscreens are nearly clear as shown below:



23.    The formulation of the Unseen Face Sunscreen allows it to double as a primer, which is a cosmetic product used to allow makeup to go on more smoothly and stay on longer.

24.    Supergoop describes the Unseen Sunscreens as: "[t]he game changer, the industry-innovator, the original invisible SPF" and an "award-winning, iconic bestseller."

25.    The Unseen Face Sunscreen was launched in 2018 and was sold in four sizes. The cost and size of each as of December 2024 (except as noted) is shown in the chart below:

| Size | Price |
|------|-------|
| 2.5 oz | $48 |
| 1.7 oz | $38 |
| 1 oz | $28 (discontinued, price as of 2023) |
| .68 oz | $22 |

26.     The Unseen Sunscreens' unique "invisible" formula and high represented SPF values have made them extremely popular. On Amazon.com, the Unseen Face Sunscreen is the #10 ranked product in the Facial Sunscreen category and has over 15,000 reviews.[11]

27.     The Unseen Face Sunscreen has the following active ingredients, which absorb UV light and thus produce its SPF level, and inactive ingredients, which do not:

**Active Ingredients**: Avobenzone 3%, Homosalate 8%, Octisalate 5%, Octocrylene 4%.

**Inactive Ingredients**: Isododecane, Dimethicone Crosspolymer, Dimethicone/Bis-Isobutyl PPG-20 Crosspolymer, Polymethylsilsesquioxane, Isohexadecane, Dicaprylyl Carbonate, Meadowfoam Estolide, Caprylic/Capric Triglyceride, Polyester-7, Neopentyl Glycol Diheptanoate, Lithothamnion Calcareum Extract, Caprylyl Glycol, Butyrospermum Parkii (Shea) Butter, Jojoba Esters, Mannitol, Boswellia Serrata Resin Extract, Lecithin, Microcrystalline Cellulose, Diatomaceous Earth, Zinc Sulfate, Silica, Tocopherol.

28.     Tellingly, in late 2024, after Plaintiffs filed this lawsuit, the Unseen Face Sunscreen in SPF 40 was discontinued and replaced by a reformulated Unseen Face Sunscreen that Supergoop claims to be SPF 50.[12] The discontinuation and reformulation of the Unseen Face

---

[11]     AMAZON.COM,     INC.,     https://www.amazon.com/Best-Sellers-Beauty-Personal-Care-Facial-Sunscreens/zgbs/beauty/7792567011/ref=zg_bs_nav_beauty_4_15239990011 (last visited January 15, 2024).

[12]     SUPERGOOP!, https://supergoop.com/products/unseen-sunscreen-spf-50?srsltid=AfmBOooxnTYcQ1d4mIayjhFBtkYtlOQiAfAbmKfumYdbTIc6LdgB2uaA (last visited January 15, 2025).

Sunscreen after this lawsuit was filed suggests that the Unseen Face Sunscreen SPF 40 did not perform at the stated SPF level. Whether this new formulation, in fact, performs at SPF 50 is a fact that remains to be determined in discovery.

29.    The Unseen Body Sunscreen was launched in 2023 and comes in a 3.4 oz size that was sold for $42, and subsequently increased to $44.

30.    The Unseen Body Sunscreen has the following active ingredients, which absorb UV light and thus contribute to its SPF level, and inactive ingredients which do not:

**Active Ingredients:** Avobenzone 3%, Homosalate 9%, Octisalate 5%, Octocrylene 10%

**Inactive Ingredients:** Isododecane, Dimethicone, Caprylyl Methicone, Dimethicone/Bis-Isobutyl PPG-20 Crosspolymer, Caprylic/CapricTriglyceride, Phenyl Trimethicone, Olea Europea Olive Oil, Olea Europea (Olive) Fruit Extract, Olea Europaea (Olive) Leaf Extract, Silica Dimethyl Silyate

31.    The Products are priced at a premium compared to comparable products that are not advertised as SPF 40.

**C.    SPF**

**i.    Overview**

32.    "SPF is a measure of how much solar energy (UV radiation) is required to produce sunburn on protected skin (i.e., in the presence of sunscreen) relative to the amount of solar energy required to produce sunburn on unprotected skin."[13] A higher SPF will have a higher protection against UV radiation, and thus sunburn or other adverse effects of sun exposure.

33.    The active ingredients used in the Products, Avobenzone, Homosalate, Octisalate and Octocrylene, are chemical sunscreens.[14]

---

[13] U.S. Food & Drug Admin., *Sun Protection Factor (SPF)*, https://www.fda.gov/about-fda/center-drug-evaluation-and-research-cder/sun-protection-factor-spf (last visited Dec. 27, 2023).
[14] *Id.*

34.     Chemical sunscreens work by absorbing UV radiation before it penetrates the skin.[15]

35.     The combination and level (or percentage) of active ingredients in a sunscreen product determines its SPF level, such that products with the same active ingredients are expected to perform the same, i.e., have the same SPF.

### ii.     Consumers Care About a Sunscreen Product's SPF Value

36.     The SPF value is material to sunscreen consumers, who frequently shop for sunscreens based on a product's SPF.

37.     The SPF of product is material for several reasons. Higher SPFs provide greater sun protection, and thus reduce the risk of adverse effects from sun exposure, including sunburn.

38.     The SPF level of a sunscreen also determined whether it is recommended to prevent skin cancer.  The American Academy of Dermatology specifically recommends that everyone use sunscreen that is ***SPF 30 or higher***, offers broad spectrum (UVA and UVB) protection, and is water-resistant.[16] Products with an SPF of less than 30— such as the Unseen Sunscreen Products at issue here—would not be recommended for this use.

39.     Not surprisingly, a 2021 study published in JAMA Dermatology[17] found that 72% of participants reported that SPF was the most important factor for consumers in selecting a sunscreen.

---

[15] Skinacea, *Physical vs. Chemical Sunscreen*, https://www.skinacea.com/sunscreen/physical-vs-chemical-sunscreen.html#.UUnMMFvuW-Y (last visited Jan. 17, 2025).
[16] AMERICAN ACADEMY OF DERMATOLOGY ASSOCIATION, https://www.aad.org/media/stats-sunscreen (last visited Dec. 27, 2023).
[17] Calvin P. Tribby, et al., *Perceived Usefulness and Recall of Sunscreen Label Information by Consumers,* JAMA Dermatol., 157(5):573-576 (May 1, 2021), available at https://pubmed.ncbi.nlm.nih.gov/33760056/.

40.     Consistent with this study, the SPF of the Products was material to each Plaintiff, who would not have purchased them if they had known they were really SPF 20 or 23, and not SPF 40 as represented.

### iii.     FDA Regulations Set Forth a Testing Methodology for a Sunscreen's SPF Label Value

41.     The Food and Drug Administration ("FDA") regulates sunscreens to ensure that they meet safety and effectiveness standards. 21 CFR § 201.327(i) sets forth specific requirements to determine a sunscreen's SPF.  Pursuant to these regulations, sunscreen products are tested on the backs of human subjects, after which five successive doses of UV rays are applied. 21 CFR § 201.327(i)(2)(ii)(D)(4)(i); 21 CFR § 201.327(i)(2)(ii)(D)(5)(iii).

42.     The test must include enough subjects to obtain a minimum of 10 valid test results (21 CFR § 201.327(i)(2)(ii)(D)(3)(i)), from which the mean, standard deviation, t value and standard error ("SE") are determined.  21 CFR § 201.327(i).  The SPF Label Value equals the largest whole number less than *Mean SPF - (t x SE)*. 21 CFR § 201.327(i)(2)(ii)(D)(6)(ii).

43.     Pursuant to 21 CFR § 201.327(a), the SPF listed on the Principal Display Panel of a Sunscreen Product must be the numerical SPF value from a test result in accordance with 21 CFR § 201.327(i).  This SPF value is referred to as the "SPF Label Value."

44.     The FDA guidelines do not specify a number of bottles or physical amount of sunscreen that must be tested (e.g., 500 grams) because the properties of a given sunscreen are a product of its active ingredients, i.e., those that absorb or reflect UV light, such that the same SPF label value can be applied to all products by the same manufacture that have the same combination of active ingredients.

45.     At the same time, because sunscreen is regulated as an over-the-counter drug, a change in, or deviation from, the active ingredients of a product is material and must be disclosed.

It would also require new SPF testing to demonstrate the SPF Label Value of that specific combination of active ingredients.

### iv.    The Products Are Not SPF 40 as Advertised

46.    Unbeknownst to consumers, the Unseen Sunscreens do not provide SPF 40 sun protection as advertised.

47.    SPF testing conducted in October through December 2023 in accordance with the FDA regulations for determination of SPF Label Value revealed that the Unseen Face Sunscreen has an SPF Label Value of 23 and the Unseen Body Sunscreen has an SPF Label Value of 20.

48.    To conduct the SPF tests, Plaintiffs' counsel retained a sunscreen testing laboratory. Counsel then supplied the laboratory with bottles of the Unseen Face Sunscreen and Unseen Body Sunscreen purchased directly from Supergoop through the Supergoop.com website on August 23, 2023 (the "Tested Products"), shortly after each Plaintiff purchased their Supergoop Products. The Tested Products were kept at room temperature prior to testing, as they would be in a store where sunscreen is sold.

49.    The laboratory conducted the SPF tests between October and December 2023 in strict compliance with the FDA requirements for sunscreen testing set forth in 21 CFR § 201.327(i).

50.    To test each Product, the Tested Product was applied to the backs of ten healthy human subjects with skin types I, II, or III, as defined by FDA regulations, who were then exposed to five progressively stronger doses of UV light. The purpose of this test was to obtain the minimal erythema dose ("MED"), which reflects the smallest UV dose that produces perceptible redness of the skin (erythema) with clearly defined borders at 16 to 24 hours after UV exposure. Ten valid test results were obtained from each Product test.

51.    The SPF Label Value is determined through a series of formulas specified in 21 CFR § 201.327. The first step is to use the MED values to calculate the SPF value reflected by each test subject individually. *See* 21 CFR § 201.327(i)(2)(ii)(D)(6)(i). Next, using these individual values, the mean SPF value can be calculated. *Id*. at § 201.327(i)(2)(ii)(D)(6)(ii).  As specified in the FDA regulations, this information is then used to identify two statistical measures (a) the standard error ("SE"), and (b) the t-test value ("t"). To calculate the SPF Label, these results –i.e., the mean SPF, SE, and t-test value—are input to the following formulas— *Mean SPF - (t * SE).* The largest whole number that is less than the output is the appropriate SPF Label Value.

52.    Following this exact process, the testing described above determined that the SPF Label Value for the Unseen Body Sunscreen was 20, and the SPF label value for the SPF Unseen Face Sunscreen was 23.

53.    Defendant knew or should have known that the Products contain a materially lower SPF protection than the advertised SPF 40 stated on the Products' labels because they were required to perform the same testing in accordance with FDA regulations to determine the Products' SPF Label Values.

54.    Plaintiffs and the Class members relied upon, and purchased the Products, believing that the Products—which all had the same active ingredients as the Tested Products—provided SPF 40 sun protection as indicated on the Products' PDPs.

55.    Plaintiff Dunning would not have purchased the Supergoop Unseen Face Sunscreen product in April 2023 had she known it had an SPF Label Value of 23. At the time of her purchase, there was no indication—on Supergoop's website, the Product packaging, or elsewhere—that the Product purchased deviated from Tested Product in any way or for any reason. Plaintiff remains unaware of any evidence to support a deviation in the SPF of her Product from the Tested Products.

56.     Plaintiff Latif would not have purchased the Supergoop Unseen Body Sunscreen product in March 2023 had she known it had an SPF Label Value of 20.  At the time of her purchase, there was no indication—on Supergoop's website, the Product packaging, or elsewhere—that the Product purchased deviated from Tested Product in any way or for any reason. Plaintiff remains unaware of any evidence to support a deviation in the SPF of her Product from the Tested Products

57.     Plaintiff Beaudoin would not have purchased the Supergoop Unseen Face Sunscreen product in July 2023 and October 2024 had she known it had an SPF Label Value of 23.  At the time of her purchase, there was no indication—on Supergoop's website, the Product packaging, or elsewhere—that the Product purchased deviated from Tested Product in any way or for any reason. Plaintiff remains unaware of any evidence to support a deviation in the SPF of her Product from the Tested Products

58.     Plaintiffs would purchase the Products again if they had a true SPF Label Value of SPF 40, as advertised.

59.     Defendant's statements that the Products are SPF 40 were false and misleading to a reasonable consumer because the Products are not SPF 40 as advertised and had a true SPF Label Value of 23 (for the Unseen Face Sunscreen) or 20 (for the Unseen Body Sunscreen).

60.     Had Plaintiffs and Class members known that the Products were not SPF 40 as advertised, they would not have purchased the Products, or would not have paid such a high price for the Products.

> **v.     All Products Have the Same Active Ingredients and Should Have Performed at SPF 40 if the SPF Label Value Was True**

61.     To rule out the possibility for a defect in the manufacturing process, error in labeling, or other event that could account for the Products failing to provide SPF 40 sun

15

protection, Plaintiffs conducted a search for all news related to "Supergoop" using Google News, which returned results dated between June 20, 2017 and January 14, 2025. Google News aggregates news from more than 50,000 news sources, providing a comprehensive survey of news throughout the Class Period; had an event occurred that could have impacted the SPF value of the Products it would have been captured.[18] Plaintiffs also reviewed historical versions of Supergoop's website using the Internet Archive (i.e., archive.org) to confirm there were no notifications posted to consumers.

62.    Plaintiffs' search and review of Google News and Defendant's website reveals no evidence of any recalls, reports of contamination, labeling errors, manufacturing issues, or other events affecting the active ingredients in the Products, or their SPF value. Accordingly, there is no reason that the Products should not have performed as SPF 40 if that label indication was true.

63.    To further confirm these results, Plaintiffs also checked the FDA's website, which publishes information about drug recalls, including over-the-counter drugs such as sunscreens. As with the broader news search, there are no postings on the FDA website relating to the Products during the Class Period, including 2023.[19]

64.    Absent evidence of recall, manufacturing issue, or other event resulting in a discrepancy between the active ingredients used in the Products during the Class Period, all bottles of the Product should perform the same. Thus, the results obtained for the Tested Products apply directly to the Products that Plaintiffs purchased and reflect their true SPF Label Value.

65.    Indeed, the assumption that products with a particular set of active ingredients perform the same on an SPF test is why the FDA allows sunscreens with the same formula from

---

[18] Denis Pinsky, *10 Tips for Writers to Get Picked Up By Google News* (May 5, 2015) https://www.forbes.com/sites/denispinsky/2015/05/05/google-news-tips/
[19] FDA, *Recalls, Market Withdrawals, & Safety Alerts,* https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts

the same manufacturer to be labeled with a particular SPF even though every bottle is not tested individually. In other words, there are no FDA requirements to test multiple samples from differing batches, or samples sold in different geographic regions or through different channels because it is presumed (as sunscreen is an over-the-counter drugs) that if the active ingredients are the same those products will all perform in the same way.

66.     Supergoop touts that it discloses sunscreen test reports on its website for the Unseen Sunscreen Products.[20]  However, those tests were conducted, and the reports were published, in 2018, prior to the start of the Class Period and a change in Products' formula.

67.     Specifically, the Unseen Face Sunscreen was reformulated in or around December 2019, changing the active ingredients as follows:

|  | Avobenzone | Homosalate | Octisalate | Octocrylene |
|---|---|---|---|---|
| Original Version (sold 2018-December 2019) | 3% | 8% | **4.5%** | **5%** |
| Reformulated Version (sold December 2019-December 2024) | 3% | 8% | **5%** | **4%** |

68.     Plaintiffs Dunning and Beaudoin, who purchased their Products in 2023 and 2024, purchased the newer formulation, and not the version subject to the 2018 testing Supergoop disclosed on its website.

---

[20] https://cdn.shopify.com/s/files/1/0751/1729/7972/files/Unseen_SPF_40_Redacted.pdf?v=1705617411

69.     Indeed, Plaintiffs are unable to locate testing on the Supergoop website relating to the version of Unseen Sunscreen Face Sunscreen sold after December 2019 such that it is possible Supergoop never the subjected this version of the Product to an FDA-compliant SPF test.

70.     Notably, after the initiation of this action, Supergoop added the following disclaimer on its website in 2024:

> *PLEASE BE AWARE THAT INGREDIENT LISTS MAY CHANGE OR VARY FROM TIME TO TIME. PLEASE REFER TO THE INGREDIENT LIST ON THE PRODUCT PACKAGE YOU RECEIVE FOR THE MOST UP TO DATE LIST OF INGREDIENTS.*

This disclaimer did not appear on its website in 2023, when all three Plaintiffs made purchases of the Products, and when the Tested Products were purchased.

71.     This disclaimer does not change Supergoop's obligation under FDA regulations to test and accurately report the SPF of its sunscreen. To the extent a Product changed formula, or deviated from the stated active ingredients, Supergoop must retest that product to demonstrate that it has at least the stated SPF Label Value using the specific active ingredients to comply with FDA regulations. Any deviation from the stated SPF Label Value is a misrepresentation that cannot be disclaimed by language on a website.

72.     As a direct result of Defendant's false and misleading statements, Plaintiffs and the Class were damaged as described herein because they did not receive the benefit of the advertised SPF 40 and were deprived of the benefit of the bargain they were promised by Defendant.

## **CLASS ALLEGATIONS**

73.     Plaintiffs bring this lawsuit under Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3), and/or (c)(4) representatives of the following class:

> All persons in the United States who purchased the Products between December 2019 and the Present ("Class Period") (the "Class").

Plaintiff Dunning additionally brings her claims on behalf of the following subclass:

> All residents of, and persons in, New York who purchased the Products during the Class Period (the "New York Subclass").

Plaintiff Latif additionally brings her claims on behalf of the following subclass:

> All residents of, and persons in, California who purchased the Products during the Class Period (the "California Subclass").

Plaintiff Beaudoin additionally brings her claims on behalf of the following subclasses:

> All residents of, and persons in, Florida who purchased the Products during the Class Period (the "Florida Subclass").

> All residents of, and persons in, Michigan who purchased the Products during the Class Period (the "Michigan Subclass").

74.     The Class, New York Subclass, California Subclass, Florida Subclass, and Michigan Subclass shall be referred to herein as the "Classes." Plaintiffs reserve the right to modify, change, or expand the Class, New York Subclass, California Subclass, Florida Subclass and Michigan Subclass definitions based upon discovery and further investigation.

75.     Excluded from the Classes are: (1) any Judge or Magistrate presiding over this action and any members of their immediate families; (2) Defendant, Defendant's subsidiaries, affiliates, parents, successors, predecessors, and any entity in which Supergoop or its parents have a controlling interest and their current or former employees, officers, and directors; and (3) Plaintiffs' counsel and Defendant's counsel.

76.     **Numerosity:** The Classes each consist of at least tens of thousands of individuals, making joinder impractical.

77.     **Commonality and Predominance:** Common questions of law and fact exist with regard to each of the claims and predominate over questions affecting only individual Class members. Questions common to the Classes include, but are not limited to:

19

a.      Whether Defendant labels and advertises the Products in a way that is misleading to a reasonable consumer;

b.      whether, by the misconduct set forth in this Complaint, Defendant has engaged in unfair, deceptive, or unlawful business practices with respect to the Products;

c.      Whether Defendant's conduct violates New York Gen. Bus. Law §§ 349 and 350;

d.      Whether Defendant's conduct violates the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200;

e.      Whether Defendant's conduct violates the Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.;*

f.      Whether Defendant's conduct violates the False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.*;

g.      Whether Defendant's conduct violates the Michigan Consumer Protection Act, Mich. Comp. Laws §§ 445.902 *et seq.;*

h.      Whether Defendant's conduct violates the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq.*;

i.      Whether Defendant's labeling of the Products as SPF 40 constitutes an express warranty;

j.      Whether Defendant's breached an express warranty to Plaintiffs and members of the Classes;

k.      Whether Defendant's mislabeling of the Products resulted in harm to Plaintiffs and the Classes; and

l.      Whether Defendant should be enjoined from engaging in such conduct in the future.

78.     **Typicality:** Plaintiffs' claims are typical of the claims of members of the Classes in that Plaintiffs, like all members of the Classes, have been injured by Supergoop's misconduct by purchasing the Products that were falsely represented as SPF 40.

79.     **Adequacy of Representation:** Plaintiffs will fairly and adequately represent and protect the interests of the Classes.  Plaintiffs have retained counsel with substantial experience in

prosecuting complex litigation and class actions, including consumer protection cases. Plaintiffs do not have any interests antagonistic to those of the Classes.

80.    **Superiority:** A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Class-wide damages are essential to induce Supergoop to comply with federal and state law. Moreover, because the amount of each individual Class member's claim is small relative to the complexity of the litigation, and because of Supergoop's financial resources, members of the Classes are unlikely to pursue legal redress individually for the violations detailed in this complaint. A class action will allow these claims to be heard where they would otherwise go unheard because of the expense of bringing individual lawsuits and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

## TOLLING OF THE STATUTES OF LIMITATIONS

81.    The applicable statutes of limitation have been tolled as a result of Defendant's knowing and active concealment and denial of the facts alleged herein.

82.    Supergoop advertised the Products as SPF 40 despite knowing that the Unseen Face Sunscreen's true SPF Label Value was SPF 23, and the Unseen Body Sunscreen's true SPF Label Value was SPF 20, substantially lower than SPF 40.

83.    Plaintiffs and members of the Classes could not have discovered the full scope of Defendant's conduct at an earlier date by the exercise of due diligence because of the affirmative, deceptive practices and techniques of secrecy employed by Defendant, including, but not limited to: (1) there were no disclosures or other indication that would inform a reasonable consumer that the Products were not SPF 40 as advertised during the Class Period; (2) the manner in which FDA-complaint SPF testing is conducted is highly technical, such that Plaintiffs could not perform that

testing on their own; and (3) conducting such testing requires advanced expertise, beyond the scope of a reasonable consumer.

84.    The earliest Plaintiffs and members of the Classes could have known about Defendant's conduct was shortly before the filing of the initial Complaint in this action, which revealed for the first time that the Supergoop products were not SPF 40.

85.    Defendant was under a duty to disclose the actual SPF of the Products but did not do so. Defendant is therefore estopped from relying on any statute of limitations under the discovery rule or other appliable equitable or tolling doctrines.

86.    Plaintiffs and members of the Classes were not aware that the Products were not SPF 40 as advertised.

87.    Plaintiffs and members of the Classes exercised due diligence to uncover the facts alleged herein and did not have actual or constructive knowledge of Defendant's misconduct by virtue of their fraudulent concealment, which could not have been uncovered without the highly technical testing described above.

88.    Accordingly, all statutes of limitation are tolled under the doctrine of fraudulent concealment.

## CLAIMS FOR RELIEF[21]

### FIRST CLAIM FOR RELIEF
**Violation of New York Gen. Bus. Law § 349**
**(On behalf of Plaintiff Dunning and the New York Subclass)**

89.     Plaintiff Dunning incorporates by reference and re-alleges herein the allegations contained in all preceding paragraphs of this Complaint.

---

[21] Plaintiffs are removing their claim for injunctive relief in accordance with the Court's January 6, 2025 Order. However, they do not concede, and expressly reserve their right to appeal, the Court's dismissal of that claim and any other adverse rulings from that Order.

90.     Plaintiff Dunning brings this claim individually and on behalf of the members of the New York Subclass against Defendant.

91.     Defendant committed deceptive acts and practices by employing false, misleading, and deceptive representations about the SPF of the Products, which misled consumers to believe that the Products contained a higher SPF than they actually did.

92.     Plaintiff Dunning has standing to pursue this claim because she has suffered an injury-in-fact and has lost money or property as a result of Defendant's deceptive acts and practices. Specifically, Plaintiff purchased the Products for her own personal use. In doing so, Plaintiff relied upon Defendant's false, misleading, and deceptive representations that the Products provided SPF 40 sun protection, when in fact FDA-compliant laboratory testing described herein has revealed that they do not. Plaintiff spent money in the transaction that she otherwise would not have spent had she known the truth about Defendant's advertising claims.

93.     Defendant's deceptive acts and practices were directed at consumers as they are the purchasers of its Products, and the misrepresentation appears on the Products' packaging.

94.     Defendant's deceptive acts and practices are misleading in a material way because they violate consumers' reasonable expectations. Defendant knew consumers would purchase the Products and/or pay more for them under the false – but reasonable – belief that the Products would provide SPF 40 sun protection as labeled, when they do not. By advertising prominently that the Products provide such benefits, Defendant proves that information about these benefits is material to consumers. If such information were not material, Defendant would not feature it prominently on the front label of the Products. As a result of its deceptive acts and practices, Defendant has sold thousands of the Products to unsuspecting consumers across New York and nationwide. If Defendant had advertised its Products truthfully and in a non-misleading

fashion, Plaintiff and other members of the New York Subclass would not have purchased them or would not have paid as much as they did for them.

95.    As a direct and proximate result of Defendant's false, misleading, and deceptive representations, Plaintiff Dunning and other members of the New York Subclass were injured in that they: (1) paid money for the Products that were not what Defendant represented; (2) were deprived of the benefit of the bargain because the Products they purchased were different than Defendant advertised; and (3) were deprived of the benefit of the bargain because the Products they purchased had less value than if Defendant's representations about purported benefits of the Products were truthful.

96.    On behalf of herself and the New York Subclass, Plaintiff Dunning seeks to enjoin Defendant's unlawful acts and practices and recover her actual damages or $50 dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees.

## SECOND CLAIM FOR RELIEF
### Violation Of New York's Gen. Bus. Law § 350
### (On behalf of Plaintiff Dunning and the New York Subclass)

97.    Plaintiff incorporates by reference and re-alleges herein the allegations contained in all preceding paragraphs of this Complaint.

98.    Plaintiff Dunning brings this claim individually and on behalf of the members of the New York Subclass against Defendant.

99.    Defendant falsely advertised the Products to mislead consumers into believing that the Products provide SPF 40 sun protection.

100.    Plaintiff has standing to pursue this claim because she has suffered an injury-in-fact and has lost money or property as a result of Defendant's deceptive acts and practices. Specifically, Plaintiff purchased the Products for her own personal use. In doing so, Plaintiff relied

upon Defendant's false, misleading, and deceptive representations that the Products had SPF 40 sun protection. Plaintiff would not have purchased the Products, or would have paid substantially less for the Products, had she known the true SPF of the Products.

101.    Defendant's deceptive acts and practices were directed at consumers, who purchase their Products, where the misrepresentation "SPF 40" appears.

102.    Defendant's deceptive acts and practices are misleading in a material way because, as alleged above and herein, they violate consumers' reasonable expectations. If Defendant had advertised its Products truthfully and in a non-misleading fashion, Plaintiff and other members of the New York Subclass would not have purchased the Products or would not have paid as much as they did for them.

103.    As a direct and proximate result of Defendant's false, misleading, and deceptive representations, Plaintiff Dunning and other members of the New York Subclass were injured in that they: (1) paid money for the Products that were not what Defendant represented; (2) were deprived of the benefit of the bargain because the Products they purchased were different than Defendant advertised; and (3) were deprived of the benefit of the bargain because the Products they purchased had less value than if Defendant's representations about purported benefits of the Products were truthful.

104.    On behalf of herself and the New York Subclass, Plaintiff Dunning seeks to enjoin Defendant's unlawful acts and practices and recover her actual damages or $500 dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees.

**THIRD CLAIM FOR RELIEF**
**Breach of Express Warranty**
**(On behalf of Plaintiffs, the Class, New York Subclass and the California Subclass)**

105.    Plaintiffs incorporate by reference and re-allege herein all allegations contained

in all preceding paragraphs of this Complaint.

106.    Plaintiffs bring this claim individually and on behalf of the members of the Class, the New York Subclass, and the California Subclass against Defendant.

107.    Defendant, as the producer, marketer, distributor, and/or seller, expressly warranted that the Products are "SPF 40".

108.    Defendant's representations and warranties were part of the description of the goods and the bargain upon which the Products were offered for sale and purchased by Plaintiffs and members of the Classes.

109.    In fact, the Products do not conform to Defendant's representations and warranties because the Products are not SPF 40 as advertised. As alleged herein, the Unseen Face Sunscreen has an actual SPF Label Value of 23, and the Unseen Body Sunscreen has an actual SPF Label Value of 20.  By falsely representing the Products in this way, Defendant breached its express warranty.

110.    As a direct and proximate cause of Defendant's breach of express warranty, Plaintiffs and members of the Classes have been injured and harmed in an amount to be proven at trial because they would not have purchased the Products, or would have paid substantially less for them, had they known they known the Products were not SPF 40 as advertised.

111.    On December 21, 2023, Plaintiffs' counsel sent Defendant a pre-suit notice letter that complied in all respects with N.Y. U.C.C. Law §§ 2-313 and 2-607 advising that Defendant breached an express warranty and demanding that Defendant make full restitution by refunding the monies received therefrom.

**FOURTH CLAIM FOR RELIEF**
**Violations of the Consumers Legal Remedies Act ("CLRA"),**
**Cal. Civ. Code §§ 1750 *et seq*.**
**(On behalf of Plaintiff Latif and the California Subclass)**

112.    Plaintiff incorporates by reference and re-alleges herein all allegations contained in all preceding paragraphs of this Complaint.

113.    The CLRA prohibits deceptive practices in connection with the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

114.    Defendant is a business that sells sunscreen. Sunscreen is a good that is primarily for personal, family, or household use as it is applied to skin to prevent the adverse effects of sun exposure.

115.    Defendant engaged in deceptive practices in violation of the CLRA when, as alleged herein, they labeled the Products as SPF 40 even though they were not.  This false and misleading representation was material to consumers, including Plaintiffs, and violated and continue to violate at least the following sections of the CLRA:

        a.      § 1770(a)(5): representing that goods have characteristics, uses, or benefits which they do not have;

        b.       § 1770(a)(7): representing that goods are of a particular standard, quality, or grade if they are of another;

        c.      § 1770(a)(9): advertising goods with intent not to sell them as advertised; and

        d.      § 1770(a)(16): representing the subject of a transaction has been supplied in accordance with a previous representation when it has not.

116.    Defendant profited from the sale of the falsely, deceptively, and unlawfully advertised Products to unknowing consumers.

27

117.    Defendant's wrongful business practices constituted, and constitute, a continuing course of conduct in violation of the CLRA.

118.    Pursuant to Cal. Civ. Code § 1782, more than 30 days before the filing of this Complaint, Plaintiff sent to Defendant by certified mail, return receipt requested, written notice of her claims and Defendant's particular violations of the Act.  Defendant has failed to implement remedial measures.

119.    Plaintiff and the California Subclass have suffered harm, and therefore seek actual damages resulting from purchases of the Products sold throughout the Class Period to all members of the California Subclass, punitive damages, restitution, and attorneys' fees and costs. See Cal. Civ. Code § 1782(d).

120.    In compliance with Cal. Civ. Code § 1780(d), an affidavit of venue is filed concurrently herewith.

**FIFTH CLAIM FOR RELIEF**
**Violations of the Unfair Competition Law ("UCL")**
**Cal. Bus. & Prof. Code §§ 17200 *et seq.***
**(On behalf of Plaintiff Latif and the California Subclass)**

121.    Plaintiff incorporates by reference and re-alleges herein all allegations contained in all preceding paragraphs of this Complaint.

122.    Plaintiff Latif brings this claim individually and on behalf of the California Subclass against Defendant in the alternative to the Fourth Claim for Relief under the CLRA.

123.    The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

124.    The acts, misrepresentations and practices alleged herein constitute unlawful, unfair and fraudulent business acts and practices under the UCL.

### Fraudulent Acts or Practices

125.    An act or practice is fraudulent under the UCL if it is likely to deceive a reasonable consumer.

126.    As set forth herein, the representation "SPF 40" on the Products is likely to deceive reasonable consumers and the public because the Products are not SPF 40 as advertised (but SPF 20 or 23) and this misrepresentation cannot be determined without conducting highly technical testing that cannot be done by an ordinary consumer.

### Unlawful Acts or Practices

127.    The acts alleged herein are "unlawful" under the UCL in that they violate at least the following laws:

- The False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.;*

- The Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq*.;

- The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301 *et seq*.; and

- The California Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code §§ 110100 *et seq*.

### Unfair Acts or Practices

128.    Defendant's conduct in labeling, advertising, and selling the Products as SPF 40 when they were actually SPF 20 (for the Unseen Body Sunscreen) or SPF 23 (for the Unseen Face Sunscreen) was unfair because Defendant's conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers. There is no utility of Defendant's conduct—i.e., misrepresenting the SPF of the Products—that outweighs the gravity of the harm to Plaintiffs and consumers.

129.    Defendant's conduct with respect to the labeling, advertising, and sale of the Products was and is also unfair because it violates public policy as declared by specific

constitutional, statutory or regulatory provisions, including, but not limited to, the False Advertising Law, the Federal Food, Drug, and Cosmetic Act, and the California Sherman Food, Drug, and Cosmetic Law.

130.     Defendant's conduct with respect to the labeling, advertising, and sale of the Products was and is also unfair because the consumer injury was substantial, not outweighed by benefits to consumers or competition, and not one that consumers themselves could reasonably have avoided. There is no justification for misrepresenting the SPF of the Products that can outweigh the harm to Class Members who were deceived into purchasing the Products, believing they provided SPF 40 sun protection, when in fact they do not.

131.     Defendant profited from the sale of the falsely, deceptively, and unlawfully advertised Products to unknowing consumers.

132.     Plaintiff and members of the California Subclass are likely to continue to be damaged by Defendant's deceptive trade practices because Defendant continues to label and advertise the Products as SPF 40 even though that is not their SPF.

133.     Defendant's conduct caused and continues to cause substantial injury to Plaintiff and members of the California Subclass. Plaintiff has suffered injury in fact as a result of Defendant's unlawful conduct including in the form of overpayment.

134.     In accordance with Cal. Bus. & Prof. Code § 17203, Plaintiff seeks an order enjoining Defendant from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices, and to commence a corrective advertising campaign.

135.     Plaintiff Latif and the California Subclass also seek an order for the restitution of all monies from the sale of the Products, which were unjustly acquired through acts of unlawful

competition, or in the alternative, non-restitutionary disgorgement of all profits resulting from sales of the Products.

136.    Because Plaintiff's claims under the "unfair" prong of the UCL are broader than her claims under the FAL, CLRA, or UCL's "fraudulent" prong, Plaintiff's legal remedies are inadequate to fully compensate Plaintiff for all of Defendant's challenged behavior.

**SIXTH CLAIM FOR RELIEF**
**Violations of the False Advertising Law ("FAL")**
**Cal. Bus. & Prof. Code §§ 17500 *et seq.***
**(On behalf of Plaintiff Latif and the California Subclass)**

137.    Plaintiff incorporates by reference and re-alleges herein all allegations contained in all preceding paragraphs of this Complaint.

138.    Plaintiff Latif brings this claim individually and on behalf of the California Subclass against Defendant in the alternative to the Fourth Claim for Relief under the CLRA.

139.    The FAL provides that "[i]t is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services" to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

140.    It is also unlawful under the FAL to disseminate statements concerning property or services that are "untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." *Id*.

141.    As alleged herein, the advertisements, labeling, acts, and practices of Defendant relating to the Products were likely to mislead consumers acting reasonably, as to the true SPF Label Value of the Products which cannot be determined without highly technical testing.

142.    Plaintiff suffered injury in fact as a result of Defendant's actions as set forth herein because Plaintiff purchased the Products in reliance on Defendant's false and misleading claims that the Products are SPF 40.

143.    Defendant's business practices as alleged herein constitute unfair, deceptive, untrue, and misleading advertising pursuant to the FAL because Defendant has advertised the Products in a manner that is untrue and misleading, which Defendant knew or reasonably should have known, and omitted material information from the Products' labeling.

144.    Defendant profited from the sale of the falsely and deceptively advertised the Products to unwary consumers.

145.    As a result, Plaintiff, the Class, and the general public are entitled to equitable relief, restitution, and an order for the disgorgement of all monies from the sale of the Products by which Defendant was unjustly enriched.

146.    Pursuant to Cal. Bus. & Prof. Code § 17535, Plaintiff, on behalf of herself and the California Subclass, seeks an order enjoining Defendant from continuing to engage in deceptive business practices, false advertising, and any other act prohibited by law, including those set forth in this Complaint.

147.    Plaintiffs also seek non-restitutionary disgorgement of all profits resulting from sales of the Products. Because the Court has broad discretion to award restitution under the FAL and could, when assessing restitution under the FAL, apply a standard different than that applied to assessing damages under the CLRA or commercial code (for Plaintiff's breach of express warranty claims), and restitution is not limited to returning to Plaintiff and members of the California Subclass monies in which they have an interest, but more broadly serves to deter the offender and others from future violations, the legal remedies available under the CLRA and

commercial code are more limited than the equitable remedies available under the FAL, and are therefore inadequate.

**SEVENTH CLAIM FOR RELIEF**
**Violation of Michigan Consumer Protection Act**
**Mich. Comp. Laws § 445.902 *et seq.***
**(On behalf of Plaintiff Beaudoin and the Michigan Subclass)**

148.     Plaintiff Beaudoin incorporates by reference and re-alleges herein the allegations contained in all preceding paragraphs of this Complaint.

149.     Plaintiff Beaudoin brings this claim individually and on behalf of the members of the Michigan Subclass against Defendant.

150.     Defendant's business acts and practices alleged herein constitute unfair, unconscionable and/or deceptive methods, acts or practices under the Michigan Consumer Protection Act ("MCPA").

151.     At all relevant times, Plaintiff Beaudoin and all members of the Michigan Subclass were "persons" within the meaning of the MCPA, Michigan Comp. Laws § 445.902(1)(d).

152.     At all relevant times, Defendant was a "person" engaged in "trade or commerce" within the meaning of the MCPA, Mich. Comp. Laws § 445.901(1)(d) and (g).

153.     The practices of Defendant, described above, violate the MCPA for, *inter alia*, one or more of the following reasons:

   a.   Defendant represented that the Products have characteristics, uses, and benefits that they do not have (e.g., SPF of 40);

   b.   Defendant provided, disseminated, marketed, and otherwise distributed uniform false and misleading advertisements, and other information to consumer regarding the performance, reliability, quality and nature of the Products, including through the Product packaging;

   c.   Defendant represented that the Products were of a particular standard, quality, or grade, (e.g., SPF 40) when they were of another (e.g., SPF 20 or 23);

    d.   Defendant engaged in unconscionable commercial practices in failing to reveal material facts and information about the Products, which did, or tended to, mislead Plaintiff Beaudoin and the Michigan Subclass about facts that could not reasonably be known by the consumer;

    e.   Defendant failed to reveal facts that were material to the transactions in light of representations of fact made in a positive manner;

    f.   Defendant caused Plaintiff Beaudoin and the Michigan Subclass members to suffer a probability of confusion and misunderstanding of legal rights, obligations and/or remedies by and through its conduct;

    g.   Defendant made material representations and statements of fact to Plaintiff Beaudoin and the Michigan Subclass that resulted in them reasonably believing the represented or suggested state of affairs to be other than what they actually were (e.g., that the products were SPF 40 even though they were not); and

    h.   Defendant intended that Plaintiff Beaudoin and the Michigan Subclass members rely on Defendant's misrepresentations, which appear on the Product packaging, so that Plaintiff Beaudoin and other Michigan Subclass members would purchases the Products.

154.    The foregoing acts, omissions and practices proximately caused Plaintiff Beaudoin and the other Michigan Subclass members to suffer actual damages in the form of, *inter alia,* diminution in value of the Products, and are entitled to recover such damages, together with all other appropriate damages, attorneys' fees and costs of suit.

## **EIGHTH CLAIM FOR RELIEF**
**Violation of Florida Deceptive and Unfair Trade Practices Act**
**Fla. Stat. §§ 501.201 *et seq.***
**(On behalf of Plaintiff Beaudoin and the Florida Subclass)**

155.    Plaintiff Beaudoin incorporates by reference and re-alleges herein the allegations contained in all preceding paragraphs of this Complaint.

156.    Plaintiff Beaudoin brings this claim individually and on behalf of the members of the Florida Subclass against Defendant.

157.    Plaintiff brings this claim under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

158.    The FDUTPA renders unlawful unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce. Fla. Stat. § 501.204.

159.    Amongst other purposes, FDUTPA is intended "[t]o protect the consumer public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202.

160.    Defendant engaged in a deceptive act and/or unfair trade practice by manufacturing and marketing the Products as purportedly being "SPF 40" when that is not true.

161.    Defendant intended that Plaintiff Beaudoin and the Florida Subclass would rely upon its deceptive conduct including the "SPF 40" label, and a reasonable person would in fact be misled by this deceptive conduct.

162.    Plaintiff Beaudoin and the members of the Florida Subclass have been damaged by Defendants' conduct alleged herein because they would not have purchased the Products but for Defendant's unfair and/or deceptive trade practice.

163.    Therefore, Plaintiff Beaudoin and the members of the Florida Subclass have suffered injury in fact, including the full price of the Products purchased.

164.    By committing the acts alleged above, Defendant engaged in unconscionable, deceptive, or unfair acts or practices, which constitute unfair competition within the meaning of FDUTPA.

165.    Defendant's conduct is substantially injurious to customers. Consumers purchase and/or purchased the Products without knowledge that the representation that it provides "SPF 40" sun protection is false. This conduct has caused, and continues to cause, substantial injury to

consumers because consumers would not have purchased the Products but for Defendant's false labeling, advertising, and promotion. Thus, Plaintiff Beaudoin and members of the Florida Subclass have been "aggrieved" (*i.e.*, lost money) as required for FDUTPA standing, such an injury is not outweighed by any countervailing benefits to consumers or competition.

166.    Indeed, no benefit to consumers or competition results from Defendant's conduct. Since consumers reasonably rely on Defendant's representation that the Products provide SPF 40 protection, consumers could not have reasonably avoided such injury.

167.    As a result of Defendant's use or employment of unfair or deceptive acts or business practices, Plaintiff Beaudoin and the members of the Florida Subclass have sustained damages in an amount to be proven at trial.

## NINTH CLAIM FOR RELIEF
### Unjust Enrichment
### (On Behalf of Plaintiffs and the Class)

168.    Plaintiffs incorporate by reference and re-allege herein all allegations contained in all preceding paragraphs of this Complaint.

169.    Plaintiffs bring this claim individually and on behalf of members of the Class against Defendant.

170.    Plaintiffs and Class members conferred benefits on Defendant by paying money to Defendant for the purchase of the Products.

171.    Defendant has knowledge of such benefits.

172.    Defendant has been unjustly enriched in retaining the revenues derived from Plaintiffs' and Class members' purchase of the Products. Retention of those moneys under these circumstances is unjust and inequitable because Defendant misrepresented that the Products provide SPF 40 sun protection when the Products' SPF Label Values are materially lower than SPF 40.

173.    Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiffs and Class members is unjust and inequitable, Defendant must disgorge any unjust profits gained from the sale of the Products to Plaintiffs and the Class members as ordered by the Court. This non-restitutionary disgorgement of unjust profits is not captured or encompassed by Plaintiffs' damages and thus Plaintiffs lack an adequate remedy at law that would address Defendants' ill-gotten gains.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that the Court:

A.    Certify this case as a class action, and appoint Plaintiffs as Class Representatives and the undersigned attorneys as Class Counsel;

B.    Enter judgment in favor of Plaintiffs and the Classes;

C.    Enter declaratory relief as is necessary to protect the interests of Plaintiffs and members of the Classes;

D.    Award all actual, general, special, incidental, statutory, treble, punitive, liquidated, and consequential damages and/or restitution to which Plaintiff and Class members are entitled;

E.    Award disgorgement of monies obtained through and as a result of the wrongful conduct alleged herein;

F.    Award Plaintiffs and members of the Classes pre- and post-judgment interest as provided by law;

G.    Enter such other orders as may be necessary to restore to Plaintiffs and members of the Classes any money and property acquired by Defendant through its wrongful conduct;

H.    Award Plaintiffs and members of the Classes reasonable litigation expenses and

attorneys' fees as permitted by law; and

      I.      Award such other and further relief as the Court deems necessary and appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all issues triable as of right.

Dated: January 21, 2025

                                                      Respectfully submitted,

                                                      */s/ Christian Levis*
                                                      Christian Levis
                                                      Nicole A. Veno
                                                      Amanda Fiorilla
                                                      **LOWEY DANNENBERG, P.C.**
                                                      44 South Broadway, Suite 1100
                                                      White Plains, NY 10601
                                                      Telephone: (914) 997-0500
                                                      Facsimile: (914) 997-0035
                                                      clevis@lowey.com
                                                      nveno@lowey.com
                                                      afiorilla@lowey.com

                                                      *Attorneys for Plaintiffs*